First matter is Teagle v. the superintendent of Gradoford and the district attorney. Ms. Sturm, how are you? Good morning, your honor. May it please the court. Cheryl Sturm for the appellant, Gerald Teagle. I'm respectfully requesting five minutes for rebuttal. Okay. Ms. Sturm, maybe you can help me figure this out. You know, habeas cases are notoriously complicated. Usually once you wade through all the complications and the procedure morass, there's something at the end. I know once you get through the complications of this, I'm not sure there's any, what is there? Help me out. What am I missing? I'm not sure what you mean by what is there, your honor. I'm trying to figure out, well I know you're making two arguments, only one of which a COA was granted for, as to the actual innocence claim. You're claiming that testimony that you could produce after the trial, which would basically corroborate everything the DA argued at murder trial, would show your client is actually innocent. That's what I'm having a problem with. Testimony that would give your client a motive for the shooting would demonstrate actual innocence. Now help me with that. Well, your honor. Usually the motive goes the other way. Usually he's arguing motive. Your honor, I think even my client and his co-defendant, when they testified, gave a motive to this shooting. They both said that they were pistol whipped by the man earlier in the day, and they both said that he had threatened to kill them. So whether Mr. Jett's testimony creates, in his affidavit, creates a motive, I don't think is the problem here. The problem with the testimony Jett gave at trial is he totally eviscerated the self-defense argument. Obviously, if Mr. York did not have a gun, then Teagle and his co-defendant did not fire in self-defense. The affidavits don't say that York pointed a gun at Teagle, do they? No, because this time, as opposed to the first time, Mr. Jett admits that he didn't see what he said he saw before. The gun was in his lap, right? Is that what the evidence says? That the actual innocence is arising from testimony newly available after he wanted to categorize it. That the gun was in the decedent's, York's, lap. Right. Well, after you get shot seven times, you're probably not holding the gun anymore. Well, but this is, the gun was in the lap before he was shot. The two different, your client... No, Your Honor, there's nothing that says that. Where is something in your affidavit that shows that he was holding a gun? This is assuming that all the other problems you can get past. That he was holding a gun in his hand when your client and Hunter approached the car and started firing the bullets. Your Honor, the difference is that Mr. Jett testified there was no gun, period. He never saw York with a gun. He didn't know York to carry a gun. There was no gun in the car. Pardon me? Now there's a gun. Now there's a gun. Judge McKee, I think, is saying is, but where does it establish that he pointed at anybody? I don't see that in the affidavits. Well, the testimony of the two defendants was, he pointed it at me. The was no gun. Yes. They testified to that at trial, right? Correct. So there is evidence that a gun was pointed. It just doesn't come from Mr. Jett. What Mr. Jett took away from these defendants was a self-defense argument at trial. He said there was no gun. It's not until he produces the affidavit that he says why the police couldn't find a gun, because when he got to the car he took the gun off York's lap, handed it to one of the men that were standing around the car, pushed York out of the way, and started to drive him to the hospital. Now, if there's no gun, there is never any self-defense. If there was a gun and it was in the proximity of York, it was reasonable a jury could conclude that after being shot seven times, Mr. York was no longer pointing the gun. The gun had fallen onto his lap. That's a whole different scenario than to totally eviscerate the self-defense claim that these two defendants presented at trial. In addition, Mr. Jett's affidavit, for the very first time, informs that he had told the prosecutor that Mr. York had a reputation for violence. The prosecutor told the prosecutor or he told one of the detectives? He told the prosecutor. He said the prosecutor coached him. He said he told the prosecutor that he had seen York shoot a man. He told the prosecutor that York had a reputation for violence. And now, on the witness stand, the prosecutor elicits from York that he has never seen, he elicits from Jett that he has never seen York with a gun. He elicits from Jett that he has, York does not have a reputation for violence. All of this goes to the heart of a self-defense presentation to the court. So there was no self-defense by the time Jett finished on the witness stand. He now says just about everything that he said was a lie on the stand. And it's our position that that, we're not asking, we're not saying we have established that my client didn't shoot Mr. York. Well, you can't say that because you... No, we're not, and that's not our argument. That's, the commonwealth seems to think that maybe that's what we're arguing. We're saying we had a defense, was self-defense. And if not self-defense, then the jury could have found some lesser degree. But with there being no gun, with there being no explanation for how two defendants can see a gun, but the police can't find a gun and they go right up to the court, the car shortly after the shooting, then we think there is a great deal to this, including the presentation of perjured testimony and the withholding of braiding material. We have to show, it's our burden to show that if the jury had all of the evidence in front of it, including this newly disclosed evidence, there's a reasonable probability of a different outcome. And I think there... You didn't say newly disclosed then. You carefully said newly disclosed and not newly discovered. Newly discovered evidence. Well, why is it newly discovered? How does it meet the test of newly discovered? There's no... Why couldn't this evidence have been obtained at the time of the trial? Jet... You've got Jet, you've got Murray, you've got Muhammad. Jet approached my client's sister at a funeral and said... Right, no, that's 22 years later. Let's back that up. If I may just say exactly what he said, because the prosecution has misrepresented it. Okay, but why don't you answer my question, and then you can say what you want to say. Okay, all right. Sorry. But let me first get to say what I want to hear you say, and that's the answer to my question. You've got Jet, you've got Murray, and you've got Muhammad, the three affidavits. Right. As to Jet, I guess you're arguing that the reason that's not, that that class, that fits within the definition of newly discovered evidence, was because you couldn't have gotten it before because he had decided he was going to, from your perspective, go south and take the gun out of the car. And he wasn't, for whatever reason, he wasn't available to you as a witness to tell the truth until 20 or 22 years later. But as to the other two witnesses, even if you're right as to that, and maybe that's enough, I don't know. As to the other two witnesses, there's no evidence that you even tried to, the defense counsel at the time, even tried to contact or interview those witnesses. Well, I think, Your Honor, that when I got the affidavits from the additional two witnesses, I was anticipating I was going to get an evidentiary hearing. There was going to be a credibility determination regarding Jet, and that these two witnesses would add to the credibility of what Jet would say if there was an evidentiary hearing. I think my strongest argument is, as far as newly discovered evidence, it's the Jet affidavit, and I think the Jet affidavit is enough. Because it is, this was the only witness. There were no other eyewitnesses who testify the Commonwealth as to the facts of this shooting except Conrad Jet. Okay, he was it. Okay, now if everything he said on the stand was a lie, there's a reasonable probability, if that was called to the attention of the jury, that the testimony was perjured, that the prosecutor suborned the perjury, the prosecutor withheld exculpatory evidence, Jet was angry with the defendants, he lied because he was angry at them, they killed his friend. Well, there are two other witnesses. Hunter and Tegel are two other witnesses. Right, but no, I said he was the only prosecution witness. I'm sorry, that's what I meant to say. And his testimony was that they approached the car, they posed the driver's window from the rear of the car, or does he say what direction they came from, his affidavit? I can look it up for you, and I don't remember. I know his version of, I believe his version that he testified to at trial is that he saw the shooting. I believe his version in the affidavit is, I was in another house. Okay, he drove me to this house, I went inside, I wasn't there for five minutes, okay, and I think he's not necessarily saying that he did see the shooting this time. I'm not sure about that, Your Honor. If he didn't see it, and maybe, put me on this, and I'll ask Mr. Goldsboro the same question. As I recall the testimony here, Tegel and Hunter approached the car that York was in on the driver's side from the rear and started opening up, each fired five or six shots into the guy's head, basically. If that's the case, and I'm not sure where that came from, I don't know if that's what your client admitted to, or if that's from Jett's trial testimony, but if that's true, even if there's a gun in the car, how do you get self-defense out of that? It does make sense to me, because it explains what I couldn't figure out from before. Why did he just pick the guy up, especially with kids in the car, walk up to the driver's side and open, take a pistol and basically blow the guy's head off. But if there's a grudge because you've been pistol-whipped by the guy before, and you find him and you walk up to the car from behind, open fire on him, even if he's got a gun there. I don't think there was ever any testimony that they came up from behind. The testimony from Teagle is he was approaching the door, the car, to say, I still don't have the $100 that I owe you for the drugs. And as he approached the car to give his explanation as to why they didn't have the money, Marvin York pointed a gun at them, and when he did that, they fired at York. I don't believe there's any testimony. Your Honor, one thing I did want to clarify, because this is very crucial, I think, to the timeliness issue, is the Commonwealth claims... Well, that's not because of the Certificate of Appealability. We started out from that point. Okay, well, I'm asking the Court to grant a COA on our issue whether the habeas court erred in finding the PCRA was not properly filed so as to toll the statute of limitations, where the District Court relied on the opinion of the Superior Court. What Judge DelZell said in his opinion at AA18 is he concluded he was bound by the Pennsylvania Court decision that the PCRA was time-barred. In April of 2009, the United States Supreme Court decided Cone v. CONE v. Bell, 129th Supreme Court, 1769, April 2009. What Cone says is federal habeas is not barred every time a state court invokes a procedural rule to limit its review of a state prisoner's claim. We have recognized that the adequacy of the state procedural... We are more familiar with that than you can possibly know. We are asking that the Court find that a COA should grant on this issue as Judge DelZell erred when he concluded he could not look into the adequacy of the PCRA rule finding this time-barred in order to be adequate... How about merit? How about what we said in merit though? Didn't we say that would be undue interference? Well, Your Honor, I think that whatever has been said, Cone v. Bell clarifies what a habeas court may do in... How about Pace? Supreme Court case. Allen v. Siebert. How about that one? Your Honor, I think that Cone wants to clarify that you can't be barred from federal review of a federal question of your state prisoner every single time a state comes up with a procedural rule to bar your federal petition. The habeas court has to look at whether it is adequate. In this case, this rule was not consistently applied. I have never seen a rule where the only information counsel would have is... We are really doing the same argument. You have five minutes. While you are saying to think about also whether or not the inconsistency of the state application of that rule arises from the fact that the Supreme Court had a practice before Albrook, which I guess was 96, of giving habeas, of giving review in capital cases even though its normal procedure would be to not review an issue. I am not sure where you are going. It helps you very much if we don't have a capital habeas case that fits into the Albrook line of cases. But you will have time and rebuttal to get into that. Good morning, Your Honor. Good morning. John Goldsbrough from the Philadelphia District Attorney's Office. I represent the appellees here. The time bar dismissal of this case should be affirmed. You want to argue time bar too, even though there is no certificate of appealability. Arising from the claim of actual innocence. Right. Which this Court has not yet ruled on. But this Court has already ruled in the Horning case that reasonable diligence, which is required for any other species of equitable tolling, is also required for an actual innocence claim of equitable tolling if that is eventually to be recognized. This Court has deferred ruling whether or not. Everybody seems to duck it. That's correct. Should we even get there? Should we focus first on whether a credible claim of actual innocence can be made here? Yes. Yes, Your Honor. And I believe that's exactly the ducking that Judge Van Antropen was referring to. Because in all cases but one, the Sixth Circuit case, Souter, that's correct, there's been no facial showing of actual innocence. And that is because in general, most of these claims are made through recanting witness affidavits as we have here. And those have been held inherently unreliable. The schlup standard is new reliable evidence of actual innocence. What if we had a situation such as where Jed is saying he told the prosecutor about his reputation for violence, the earlier incident where York pistol-whipped Tegel with a pistol and the prosecutor nevertheless puts Jed on the stand, gets testimony which is totally inconsistent to evidence that the testimony that the prosecutor had been told before the trial, assuming this is true, I'm not saying it's true, but assuming it's true, doesn't that create a problem here where the prosecutor stands by as an officer of the court knowingly elicits perjury testimony from the only eyewitness to the, not the only eyewitness but the prosecution's major witness to the trial, to the crime, doesn't say anything, doesn't go to the sidebar and say, you know, Judge, there's a problem here. This is not what the witness told me earlier. Certainly, if that's credible, if that's reliable, if we're giving credence to the recanting witness affidavit which is held unreliable per se in all the case law. And, in addition, there's another requirement. Not only do you have to have a reliable showing of actual innocence, but you have to show that no juror acting reasonably under these circumstances would vote to convict. So, and that's only on the actual innocence, on the extraordinary circumstances prong of equitable tolling. But the reasonable diligence prong, I think, is the elephant in the room here. Because Ms. Sturm is, as we were discussing before, as Your Honors were discussing, I believe ignoring the Supreme Court's rulings in Allen v. Siebert, that this court, federal courts, don't second guess state courts about their application of state time bar rules. That was at issue with our office in the Pace case and they said that very clearly. If the state court rules that it's untimely, that the PCRA was filed in an untimely fashion, then it's untimely and we can't second guess that. That's what happened here. But yet, the question that Ms. Sturm is asking this court to certify is whether the state court was wrong under state law and or under federal law in its state time bar ruling. And I believe that there's just no possibility that this court can review that question. But under AEDPA, couldn't you still bring in an actual innocence claim in federal court, even if there's a procedural default in state court? If there's a procedural default and a timely federal habeas petition, yes. Right, so the problem here isn't so much, the problem that you see in Teagle's position is not so much that he blew the 60 day state limit, it's that while he was blowing the 60 day state limit, he didn't file a concurrent petition in federal court. That is correct. And seek a stay and obey. Yes. So you don't have a situation where he's 10 or 20 days late in the state system, you've got a situation where he's three years late or two years late in the federal system. Yes, assuming that his ignorance of Jett's change of mind is the obstacle to his filing under equitable tolling, because it requires an obstacle, then that obstacle is definitely removed when he has the affidavit in 2004. Yet he doesn't come here until 2007. But the Supreme Court hadn't yet established the stay and obey doctrine. When was that case decided? Offhand, Your Honor, I'm not recalling. But they would have had one year from the date, if I remember correctly, that opinion of the Supreme Court said, for the rule that we're establishing now, people are going to get one year from this date. Is that right? Well, if we're talking about equitable tolling, which I believe we are in this context, there's not a clear one year. We just have to show reasonableness. No, I thought the one year, I thought they said under Yes, yes. So and in fact, that that might be a good moment for just a tangent there. Simply, I don't believe that. And I think I said three circuits have, I believe, ruled this, that there's any need for actual innocence equitable tolling because the statute itself has an exception for the one year. I've been trying. I've been trying to conjure a situation. I guess it's, I'll ask Mr. Sturm, but trying to conjure a situation where you would need equitable tolling based upon the newly discovered evidence opportunity under EDPA. So if a fellow is wrongly convicted and six years later, there's DNA exoneration or some other exoneration evidence, he has one year from the date that that evidence is discovered. Exactly. Correct? Yes. And so if you, if the clock can always start anew based on newly discovered evidence, why would you have an equitable tolling doctrine? That's the question I'm wondering. I'm wondering as well. Well, I guess, yeah, you want, you want that to be the case. Right. I think it's already incorporated in the statute and I really don't see any point. My question about the approaching from the rear. Where did that come from? I know I didn't just dream that. I didn't dream about this case. Your Honor, I've heard a lot of weird things. I did not dream about this case. Yes. I read that as well. And I believe it's in Jett's testimony. His trial testimony or his affidavit? His trial testimony. Yeah, I believe that's right. That it could have been Tegel. And frankly, I don't have that portion of the record with me. So I'm not able to check. If it was Tegel, boy, then there's really a problem. Yes, Your Honor. Yes. But again, I still think. It may really be a problem anyhow, but there's a huge one if it's Tegel who said, I came up behind the guy from behind and basically blew his head off. I think even if we accept the affidavit, as the district court said, just even believing the affidavit, it still doesn't meet the Schlupp standard. It still doesn't get to no reasonable juror because, as you said, as the court was discussing, it doesn't have to do with whether the victim pointed a gun before he was murdered. So there's nothing about that. And that would be the relevant claim. But it's not there. So even believing it. But I don't think we even get there because this is an unreliable affidavit. You understand what I'm saying? I do. The law loves a coward. Yes. You're supposed to run away before you hurt somebody. If there's something like that going on. But, of course, we have no evidence that something like that was going on. So now just if we believe the affidavit, OK, a gun was in his lap when he was shot. And as Your Honor said, Judge McKee, maybe the gun was in his lap at the time he was shot. And I always get confused with this. Would Schlupp be dealing with this factual or actual innocence? Because if he failed to exercise his duty to retreat before he was in deadly force, that would probably get him to manslaughter. It would take the first degree murder away from him, which would be a gigantic difference. It would negate the element you need for first degree murder. It would get you to the voluntary manslaughter. So it would make him actually innocent of first degree murder. It may not be what Schlupp is talking about. So, Your Honors, I suppose my position is clear. And I don't know if the Court has any other questions about this. They did say at trial that he did point a gun at them or one or both defendants. They claimed that. That was their claim at the time. And that was discredited. But you're talking about Wyatt Earp. Someone points a gun at you, and you are quick enough to get your gun out of the waistband or holster or wherever it is, and get off five shots before the decedent can even pull the trigger. That makes Matt Dillon look like he's dyslexic. Yes, Your Honor. Okay, Mr. Dermot, you have time. Mr. Dermot, I have a couple of questions. The first one is, you stated a few minutes ago that Marvin York pointed the gun at Teagle and Hunter. Where in the record is that? That's what Teagle and Hunter testified to. All right. Well, that's not newly discovered evidence. I'm not claiming it is. Jett didn't say that York pointed a gun at Teagle and Hunter, right? Jett said there was no gun to point. That was his testimony at trial. No, no, I mean in his affidavit. No, I found the... The investigator asked Jett to say what he saw. He said, when I came out, I saw Teagle and Hunter approach the car from different directions. Then they started shooting. I yelled for Marvin to pull off. I don't know where Your Honor saw that the shooters came from behind. It wasn't my client's testimony. It wasn't in Jett's affidavit. I'm sorry, I didn't reread Jett's trial testimony. Let me just ask my second question. Can you illuminate for me this issue? When would you need equitable tolling? Why wouldn't AEDPA's provision for a one-year statute of limitations that begins to run upon the finding of newly discovered evidence, why wouldn't that cover the entire universe, and why would there be some equitable tolling gloss that would be put over that? Can you think of a situation where you would need equitable tolling, where what's in the statute would not solve your problem? I can't think of that offhand. I think the only one I can think of is where the person is misled. They're misled by the government, and inaction is the only one I know of. But if they're misled, why would the clock start running? Let's say you find out the facts and you come down, you're ready to file, and the government says, don't worry, it'll be okay, you don't have to file this, that type of situation. I hope this answers one of the questions that was asked earlier. In Glass v. Vaughn, 65 Fed Third, Third Circuit, 1995, the circuit said it assumed actual innocent test applied to non-capital cases. I don't think there's any doubt about that. I thought that was a question that you had asked. No, I was talking about actual innocence in terms of factual versus legal innocence, so that if you have evidence that shows that it negates in a first-degree murder case, evidence that would negate the element you need for specific intent, that would get it away from first-degree murder, maybe reduce it to third-degree murder or manslaughter, but you're still guilty whether or not that is the subject. We're not disputing guilt, we're saying he's not guilty of first-degree murder under the facts that Jett's affidavit introduces. And finally, the point that I've been trying to get to, the Commonwealth has misrepresented a crucial fact to the Court. The Commonwealth has misrepresented that when Jett encountered Katherine Teagle, he said to Katherine Teagle he wished to change his testimony about whether the victim had a gun in his lap. That is not what he said. Ms. Teagle's affidavit is at AA-186 of the appendix. What he said was he wanted to clear his conscience. He wanted to come forward about the testimony he gave on the gun. He said he wanted to clear his conscience. I asked Conrad if he would mind talking to my brother's lawyer. Now, it's our position that that is not an adequate bar to federal review here, to find that that started the 60-day statute of limitations. That is not how that would begin to be calculated consistently in Pennsylvania. It is not clear to anyone that if someone comes forward and makes a general statement, I want to clear my conscience, I want to change what I said about the gun, that I would then rush in and file a PCRA or Rule 90-902. The person who basically led your brother to the defendant's conviction comes forward and says I want to clear my conscience. What I said wasn't true at the murder trial. That doesn't start bells and red flags going off saying, wait a minute, why doesn't that start the clock running? It says a red flag, I need to send an investigator to find out what the facts are. When the investigator met with him, this was stated in the end of March. The investigator met with him in the middle of May. The PCRA was filed within 60 days of the day that I got that affidavit explaining, what about the gun do you want to change your testimony? You want 60 days from the investigator's report, right? It was filed within 60 days of the investigator's report. You think the clock starts running when the investigator issues the report? When I have what 902 requires. If the investigator takes five years to do the investigation, the clock starts running after five years. I can see that there could be some argument, but certainly we were out within 60 days to meet with the witness. But it wasn't within 60 days of that meeting. There's a time bar after time bar after time bar after time bar that's breached here. If this PCRA was timely filed, then there is no other breach of any other time bar. There is no breach of any time bar, including the federal, because a timely filed PCRA would have told the time bar in federal court. What would I have put in a PCRA without getting... This is not anybody who's under my control. The investigator has to have a package to understand who is Conrad Jett. What did he have to say in this case? Wait, the investigator's not under your control? That's not your agent? Pardon me? The investigator is not acting as the defendant's agent when he goes out and interviews Jett? Sure, but he has to know something about the case. The first thing he needs to know is he needs to deal with it in the next three or four or five days or eight days because we're on a 60-day clock. Not if I don't know there is anything to the statement. I have an attorney to investigate. Wait, wait, wait, wait. In the real world, you know that when you send an investigator out there, you must be thinking this is something other than an incredible waste of your time and money and effort. Or you're going to send the investigator out. So when you send the investigator out, you must be curious about what Jett is going to say to the investigator. Why don't you, in this incredible age of omnipresent cell phones, tell the investigator, call me as soon as you get done talking to him so I can find out what you got from him? He did. Right away? He called you right away? Yes. Then why wouldn't the clock start to run? He gave me a written report right away. The witness was interviewed when the witness wanted to be interviewed. Okay? The investigator has to know what the case is about. So now the clock begins to run based upon when the recanting witness decides to sit down and submit to an interview. Well, it depends on when I get the information that 902 requires. I have to attach a certification about what this witness will say. You said he got the information right away. No, I said as soon as the investigator spoke to the witness, he conveyed the information to me. Right, so you knew it right away. As soon as the investigator spoke to the witness, you knew it. Right, which was in May. Before you got the report. Which was in May. No. But why would he speak to the witness in May when the witness comes forward in March? Because it takes time to get an investigator. It takes time to put the package together. It takes time for the investigator to contact the witness. I mean, this is the real world. I don't have a stable of investigators like the district attorney's office does. We acted in a timely fashion, and I have a duty to the court. I can't file some vague PCRA. You can't say you think you might find something. I understand that. You need to file facts. But you're saying you filed, and I have to check the record because it's in the appendix. Are you saying that you filed within 60 days of the date you got the report or 60 days of the date of the interview or both? Because I asked you before, and you said you knew as soon as the interview that this was something that you had to act on, and you filed within 60 days of that. I thought that was not the case. No, I did. I couldn't find in the record the date that he was interviewed. Do we have that? I know the date that the investigator issued the report. A-148. On May 17, 2004, we interviewed Conrad Jett regarding this incident. The summary of this interview follows, and this is a letter dated May 19, 2004, to me. So he interviewed him on May the 17th. On May the 19th, he is sending me his report. And you filed when? We filed our PCRA. I do have it, Your Honor. Can I have just a moment? I have it, too. PCRA was filed June 28, 2004. So I got the information on May 17, 2004. Well, he wrote the letter to me. He was interviewed on May 17th. I got the report on May 19th. I filed on June 28, 2004. Thank you. Thank you very much. We thank you both for your argument.